## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| T.R., | : | CIVIL ACTION |
|     Plaintiff, | : | |
| | : | |
|   v. | : | No. 13-2931 |
| | : | |
| COUNTY OF DELAWARE, | : | |
|     Defendant. | : | |

## M E M O R A N D U M

**SITARSKI, M.J.**                                    **Date: August 22, 2014**

Currently pending before the Court is a motion for summary judgment filed by Defendant Delaware County.  For the following reasons, the motion will **GRANTED**.

## I.        INTRODUCTION

Plaintiff filed his Complaint on May 28, 2013 against the Delaware County Office of Behavioral Health, Steve Akpunonu, Donald Havens, and John and Jane Doe.  (Doc. No. 1).  This matter initially was assigned to District Court Judge Juan R. Sanchez.  On July 17, 2013, the parties consented to the exercise of jurisdiction by a United States Magistrate Judge under 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, and the matter was referred to me.  (Doc. No. 15).

Prior to consenting to Magistrate Judge jurisdiction, Defendants had filed a motion to dismiss.  (Doc. No. 8).  On September 6, 2013, this Court granted the motion to dismiss in part and granted Plaintiff leave to file an amended complaint.  (Doc. No. 21).  On September 20, 2013, Plaintiff filed an Amended Complaint against the County of Delaware, Steve Akpunonu, Donald Havens, and John and Jane Doe.  (Doc. No. 22).  On October 3, 2013, Defendants Steve Akpunonu and Delaware County filed a second Motion to Dismiss.  (Doc. No. 23).  The next

day, Defendant Donald Havens filed a separate Motion to Dismiss (Doc. No. 24).  On November 26, 2013, this Court entered an order dismissing the claims against Defendant Akpunonu in his individual capacity and the claims against Donald Havens.  (Doc. No. 28).  As a result, only the claims against Delaware County remain.  (*Id.*).

On June 19, 2014, following completion of discovery, Defendant Delaware County (hereinafter "Defendant" or "The County") filed the instant Motion for Summary Judgment, accompanied by a Statement of Undisputed Material Facts.  (Doc. Nos. 39, 40).  On July 11, 2014, Plaintiff filed a Response and "Statement of Disputed of Undisputed Facts."   (Docs. No. 44-45).

The matter is now ripe for disposition.

## II.      FACTUAL BACKGROUND[1]

This litigation arises out of the involuntary commitment of Plaintiff pursuant to Section 303 of the Pennsylvania Mental Health Procedures Act.  As will more fully be discussed below, Plaintiff claims that his involuntary commitment violated his procedural due process rights to a hearing and counsel.  Plaintiff claims that the County is responsible for presenting petitions, and had an unconstitutional custom of "presenting petitions it knew to be predicated on involuntary, unknowing waivers that had been made without the benefit of consultation with counsel."  (Pl. Resp. at 3).

---

[1]  The following facts are either undisputed, or are taken in the light most favorable to Plaintiff, the non-moving party.

**A.      Overview of the Involuntary Commitment Procedure in Delaware County.**

The events at issue occurred during the process known as "Mental Health Court."  As discussed below, Plaintiff contends that patients are entitled to certain rights under Pennsylvania statute if they are involuntarily committed to a mental health facility.

Pennsylvania's Mental Health Procedures Act of 1976 ("MHPA"), 50 Pa. Stat. Ann. § 7101, *et seq.*, provides a general framework for involuntarily committing a person for mental health treatment.  The initial commitment is done under MHPA § 302, and extends for a period of 120 hours.  (Havens Dep. at 24).  If the patient's treating doctor (i.e. the doctor who initially evaluated the patient) believes the patient should be committed longer than that, he will recommend that the patient's commitment be extended, and will file a petition under § 303 of the MHPA (hereinafter "Section 303"), which extends an involuntary commitment for up to twenty additional days.  (*Id.* at 24).  Under Section 303 of the MHPA, a person is afforded certain protections before they can be committed, including appointment of counsel, and the right to challenge the doctor's Section 303 recommendation at a hearing before a Mental Health Review Officer.[2]

---

[2]  Section 303 states, in relevant part:

(a) Persons Subject to Extended Involuntary Emergency Treatment. – Application for extended involuntary emergency treatment may be made for any person who is being treated pursuant to section 302 whenever the facility determines that the need for emergency treatment is likely to extend beyond 120 hours.  The application shall be filed forthwith in the court of common pleas, and shall state the grounds on which extended emergency treatment is believed to be necessary. The application shall state the name of any examining physician and the substance of his opinion regarding the mental condition of the person.

(b) Appointment of Counsel and Scheduling of Informal Hearing. – Upon receiving such application, *the court of common pleas shall appoint an attorney*

1.        **Initiation of Section 303 Commitment Procedures.**

The undisputed factual record evidences the manner in which involuntary commitments pursuant to Section 303 are customarily handled at Crozer-Chester Medical Center. If the patient's treating doctor files a Section 303 petition for extended involuntary commitment, the patient is seen by an independent psychiatric examiner. At all times relevant, the independent psychiatric examiner at Crozer-Chester was Dr. Theodore Barry, M.D. Dr. Barry provides these services pursuant to a letter agreement with the Delaware County Office of Behavioral Health ("OBH"), through which he provides expert testimony at the involuntary commitment hearing as to whether the patient has met the requirements for extended involuntary treatment. (*See* Pl. Ex. J).

The filing of a Section 303 petition is also the catalyst for the court appointed attorney to begin his representation of the patient. (Havens Dep at 24.). Since 1983, Attorney Donald Havens has been appointed by the Delaware County Court of Common Pleas to represent patients in involuntary commitment hearings (*Id*. at 21). Havens is a Delaware County Court of Common Pleas employee, and since 1983, has been the only appointed patient attorney.[3] (Pl. Ex.

---

who shall represent the person unless it shall appear that the person can afford, and desires to have, private representation. Within 24 hours after the application is filed, an informal hearing shall be conducted by a judge or by a mental health review officer and, if practicable, shall be held at the facility.

§ 7303(a), (b) (emphasis added).

[3] Plaintiff disputes that Mr. Havens is a court employee, and argues that he is a County employee. However, a review of the exhibit Plaintiff relies on in support clearly states that Mr. Havens is an employee of the court system. (Pl. Ex. N). Plaintiff does not point to any other evidence to support his assertion that Mr. Havens is a County employee and his argument is clearly contradicted by the evidence of record. Accordingly, Plaintiff has failed to establish a genuine issue of material fact as to whether Mr. Havens is a County employee.

N).

Up until 2011, Dr. Barry would meet with patients to determine whether they agreed to their treating doctor's recommendation for further involuntary commitment. Specifically, Dr. Barry would inform the patients that if they do not agree with their doctor's recommendation of continued treatment, they could challenge the recommendation at a hearing, where an attorney would be appointed to represent them. (Havens Dep. at 43-44).[4]  Dr. Barry would also inform the patient that they could opt to forego to a full hearing and continue treatment; if they so agreed, Dr. Barry would consider them to have waived the right to appear for a full hearing. (*Id.* at 39).

During these meetings, Mr. Havens would stand outside Dr. Barry's door and listen, to confirm that the patient agreed to the extended commitment. (*Id.* at 30)  If the patient agreed to extended treatment, Dr. Barry would appear in Mental Health Court, and report on the record that the patient agreed to extended treatment. (*Id.* at 30-31)  Mr. Havens would not consult with the patient in such cases, explaining that he didn't wish to interfere with a patient's decision not to challenge the extension. (*Id.* at 25)

---

[4]  Mr. Havens deposition testimony concerning Dr. Barry's meeting with patients was far more detailed than Dr. Barry's. While Mr. Havens testimony concerning Dr. Barry's statements to patients is hearsay, it may be considered on summary judgment because it is based on his personal knowledge, and Dr. Barry would be available to testify about those statements at trial. *See Barr v. County of Clarion,* 417 F. App'x 178, 180 n.4 (3d Cir. 2011) ("hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial") (citation omitted); *Palfrey v v. Jefferson-Morgan Sch. Dist.*, 355 Fed. App'x 590, 593 n.1 (3d Cir. 2009) ("hearsay evidence in a deposition may be considered on summary judgment "if the out-of-court declarant could later present that evidence through direct testimony, i.e., in a form that would be admissible at trial") (citations omitted).

### 2.   The Section 303 Hearing.

If a patient wishes to challenge his/her physician's recommendation for further inpatient treatment (i.e., challenge the recommendation for Section 303 commitment), a hearing (also referred to as "Mental Health Court") is held before a Mental Health Review Officer, who is appointed by the Delaware County Court of Common Pleas (Def. Ex. F at 109).  The following people are present at the Section 303 Commitment Hearing:

1.   Dr. Barry, the independent psychiatric examiner;

2.   Donald Havens, Esq., the patient's attorney;

3.   Collen Marsini, Esq., the attorney who presents the 303 petitions on behalf of the petitioner;

4.   A Mental Health Review Officer;

5.   A court reporter;

6.   Steve Akpunonu, the OBH Mental Health Court coordinator.

(Akpunonu Dep. at 24, 53).

Steve Akpunonu is the Mental Health Court Coordinator for Mental Health Court at Crozer-Chester Medical Center.  He is employed by the Delaware County OBH, and has been so employed since 2007.  (*Id*. at 23).  Mr. Akpunonu testified that, the day before Mental Health Court, he receives paperwork from the hospitals containing information for patients who have been recommended for Section 303 commitment.  (*Id*. at 34).  Mr. Akpunonu then processes the paperwork to create a "docket," which is essentially a list of people who will be having involuntary commitment hearings the following day.  The morning of Mental Health Court, Mr. Akpunonu will receive the original Section 303 petitions from a hospital staff member.  (*Id*. at 129).  He then checks to see if the Section 303 petition contains the necessary information for the

6

Mental Health Review Officer to make his decision (i.e. the treating Doctor's recommendation for further treatment).  If the petition is incomplete, Mr. Akpunonu will follow up with a social worker; the hearing will not go forward until the petition is completed.[5]  (*Id.* at 130-131). Assuming the paperwork is complete, a patient will have his hearing in the order set forth in the docket created by Mr. Akpunonu.

At the hearing, Ms. Marsini, the County Solicitor, presents the Section 303 petitions on behalf of the petitioner, which is usually the hospital. (Marsini Dep. at 10, 21).  Ms. Marsini begins her presentation by calling the independent psychologist (Dr. Barry), who will put his findings and recommendations on the record.[6]  (Havens Dep. at 29).  Then, Havens will cross-examine the doctor, and may call the patient or witnesses (such as family members) to challenge the findings of the doctor.  (*Id.*).

After the necessary testimony and evidence have been presented, the Mental Health Review Officer will then decide whether to hold the patient for further involuntary treatment.  If the Mental Health Officer orders the patient to be involuntarily committed, the patient has the right to appeal his involuntary commitment by petitioning to the Court of Common Pleas.  50 P.S. §§ 7303(g), 7109(b).  On appeal, a Judge of the Court of Common Pleas will review the findings of the Mental Health Review Officer.  *See In re Interest of K.L.S.*, 594 Pa. 194, 198-99 (2007).

---

[5]  In Plaintiff's case, the part of the form indicating that a patient had been read his rights was not checked.  Mr. Akpunonu testified that this omission did not cause him to follow up with a social worker because it did not relate to the doctor's treatment recommendation.  (Akpunonu Dep. at 177-78).

[6]  Defendants contend that the treating psychologist is also at the hearing.  Plaintiff disputes this, and contends that only the independent psychologist attends the hearing.

7

### B.      Commitment of Plaintiff.

Plaintiff has suffered from depression and bipolar disorder since 2006.  (Am. Compl. ¶ 11).  On May 25, 2011, upon the advice of a psychiatrist, Plaintiff drove himself to Crozer-Chester Medical Center, which serves as one of the two psychiatric crisis centers in Delaware County.  (Am. Comp. ¶ 17, 20).  After Plaintiff informed the intake nurse that he was having suicidal thoughts, he was evaluated by a hospital psychiatrist.  Following this evaluation, Plaintiff was involuntarily committed under Section 302 of the MHPA.  He was given a number of papers to sign, including a Section 302 Notification of Rights.  Plaintiff claims that he signed the notification without reading his rights and without being told he was being involuntarily committed.

The next day, Dr. Rommel Rivera and a social worker (DeAnna Chiddick) both informed Plaintiff that there would be proceedings the following day regarding a further involuntary commitment.[7]  (Am. Compl. ¶ 23).  Dr. Rivera also told Plaintiff that he wanted him to stay longer.  Thereafter, Plaintiff was given a stack of papers that included a notice of intent to file a Section 303 petition to extend Plaintiff's involuntary commitment.  (T.R. Dep. At 86-88).  Plaintiff contends that the Section 303 notice, which includes things such as the Doctor's recommendation for extended treatment and a "Notification of Rights" section, was incomplete.  Plaintiff further contends that he could not understand the handwriting on the notice because it was illegible.  (*Id.* at 87).

The following day, Plaintiff met with Dr. Barry.  (*Id.* at 106).  Plaintiff testified that this

---

[7]  Dr. Rivera told Plaintiff that he would be going to court the following day, while social worker DeAnna Chiddick told Plaintiff that he would be meeting with a county psychiatrist.  (T.R. Dep. at 90).

meeting was brief, with Dr. Barry examining some papers and then asking Plaintiff if "he agreed to follow his doctor's treatment plan in lieu of a hearing." (*Id.*). Plaintiff responded in the affirmative, thinking that if he agreed to follow the treatment plan he would be discharged. (*Id.*). Plaintiff contends that Dr. Barry then informed Plaintiff that he would make arrangements for Plaintiff's discharge. (*Id.* at 110).

Unbeknownst to Plaintiff, his conversation with Dr. Barry resulted in Dr. Barry advising the Mental Health Officer that Plaintiff had acquiesced to the treatment plan, and had waived his right to a hearing to contest extending his involuntary commitment. Also unbeknownst to Plaintiff, he had been appointed a lawyer – Mr. Havens – who had been waiting outside the room and listening in on the conversation. At no time did Mr. Havens meet with or speak to Plaintiff.

Mr. Havens and Dr. Barry went to Plaintiff's hearing. (*See* Def. Ex. N). At the hearing, Dr. Barry informed the Court that Plaintiff had "waived" his right to a hearing, and Mr. Havens corroborated this. (*Id.*). As a result, Plaintiff was involuntary committed under Section 303. (*Id.*).

Meanwhile, Plaintiff had returned to his room and began gathering his things to leave, thinking he would be discharged. (T.R. Dep. at 111). Later that afternoon – after Plaintiff's hearing had been conducted in his absence – Dr. Rivera and Ms. Ciddick informed him that a judge had determined that Plaintiff's commitment should be extended. (*Id.* at 111). Plaintiff remained involuntary committed for five additional days. On that last day, Plaintiff and his wife met with Dr. Rivera and Ms. Chiddick in a pre-discharge conference, where he was given several papers to sign. (*Id.* at 124). After the conference concluded, Petitioner was released.

Around two to three weeks after he was released, Plaintiff contacted the Legal Aid

Society to inquire about getting his commitments expunged from his record.[8]  (T.R. Dep. at 137).

Subsequently, Plaintiff filed a "Petition for Expungement of Mental Health Commitments

Pursuant to 50 P.S. §§ 7109 and 7303 of the [MHPA]" in the Delaware County Court of

Common Pleas, seeking to expunge his involuntary commitments under Section 302 and Section

303.[9]  (Def. Ex. O).  On February 28, 2013, the Honorable Judge G. Michael Green of the

Delaware County Court of Common Pleas issued Findings of Fact and Conclusions of Law,

denying the Petition for Expungement.  Plaintiff appealed, and thereafter filed a "Concise

Statement of Matters Complained of on Appeal" pursuant to Pennsylvania Rule of Appellate

Procedure ("Pa. R.A.P.") 1925(b), asserting the following grounds for relief (recited verbatim):

1.    [The Court of Common Pleas] erred in denying T.R.'s Request for Expungement for Mental Health Commitments Pursuant to 50 P.S. §§ 7109 and 7303 of the Mental Health Procedures Act

2.    The Court erred in finding that T.R.'s commitment under the Mental Health Procedures Act, 50 P.S. § 7302 was appropriate and lawful;

3.    The record does not support a finding that T.R. intended to take his own life or took any act in furtherance of any plan to harm himself;

4.    This Court erred in finding that the commitment under the Mental Health

---

[8]  Plaintiff was not sure how much time passed after his release before he contacted the Legal Aid Society.  (T.R. Dep. at 138).  Similarly, the exact date that Plaintiff filed his Petition for Expungement is not clear from the record.

[9]  As noted above, the MHPA permits an appeal of an involuntary commitment, *supra* P.8.  (T.R. Dep. at 124-25).  Plaintiff apparently did not avail himself of this option; instead, he filed a Petition for Expungement.  He testified that he was unaware that he could appeal his commitment, and did not learn it was an option until the time for filing an appeal had expired. (*Id.*).  Specifically, he first learned of the availability of an appeal during the course of his expungement proceedings, when Ms. Marsini requested that his petition for expungement be dismissed because the time for filing an appeal had expired.  (T.R. Dep. at 124-25).  However, the Delaware County Court of Common Pleas examined the petition pursuant to 50 P.S. §§ 7109 and 7303, which are the sections of the MHPA that authorize an appeal.  (Def. Ex. O).

Procedures Act, 50 P.S. § 7303 was appropriate and lawful;

5.      This Court erred in finding that T.R. waived his right to due process of law;

6.      This Court erred in finding that T.R. could not have suffered any stigma from his illegal commitment because he has applied for and received Social Security Disability Benefits.

(Ex. 0, J. Green 1925(a) Opinion ).

On May 17, 2013, Judge Green filed an advisory opinion pursuant to Pa. R.A.P. 1925(a), addressing the claims raised in Plaintiff's statement of matters complained of on appeal.  The appeal is currently pending before the Pennsylvania Superior Court.  Plaintiff has been represented by an attorney throughout his expungement proceedings in state court.  (*See* Ex. O, J. Green 1925(a) Opinion at n.1; *see also* Pennsylvania Docket No. 1037 EDA 2013, at 1).

## II.      STANDARD OF REVIEW

Under Fed. R. Civ. P.  56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P.  56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 574, 586 n.10 (1986).  A party asserting that a fact is genuinely disputed, or cannot be, must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed.
R. Civ. P. 56(c)(1)(A) & (B).

To defeat a motion for summary judgment, the nonmoving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue."  *Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (internal quotations and citation omitted).  "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position — there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant."  *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993).  Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 411 U.S. at 322.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving part, there is no 'genuine issue for trial.'"  *Matsushita.*, 475 U.S. at 587.

In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005).  The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 655 (3d Cir. 2002).

III.    DISCUSSION

Plaintiff's amended complaint asserts two claims against the County of Delaware.[10]  In

Count I, Plaintiff contends that the County violated his right to procedural due process.

Specifically, Plaintiff claims that Delaware County is liable under Section 1983 because of an

"unconstitutional custom of presenting petitions it knew to be predicated on involuntary,

unknowing waivers that had been made without the benefit of consultation with counsel."  (Pl.

Mot. at 3).  In Count II, Plaintiff alleges violations of rights protected by the Americans with

Disabilities Act and the Rehabilitation Act.  We address each claim below.

### A.    1983 Procedural Due Process Claim against the County.

The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides that "[e]very person who,

under color of [state law], subjects, or causes to be subjected, any citizen of the United States or

other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws, shall be liable to the party injured...."  To

succeed in a § 1983 claim, a plaintiff must "prove two essential elements: (1) that the conduct

complained of was committed by a person acting under color of state law; and (2) that the

conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or

laws of the United States." *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011).

---

[10]  On September 6, 2013, this Court dismissed the claims against Mr. Akpunonu in his official capacity because they were duplicative of the claims asserted against the County.  (Doc. No. 21).  By Order dated November 26, 2013, this Court dismissed the claims against Mr. Akpunonu in his individual capacity because there were no allegations that he was personally involved in the alleged deprivation of Plaintiff's rights.  (Doc. Nos. 27, 28).  Additionally, this Court dismissed the § 1983 claim against Mr. Havens because there were no facts supporting the contention that he was a state actor; this Court also declined to exercise supplemental jurisdiction over Plaintiff's state law legal malpractice claim against Mr. Havens.  (*Id.*).  Thus, only the claims against the County of Delaware remain.

Section 1983 does not confer any substantive rights.  It "merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotations and citations omitted).  Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.*  Next, when the claim is asserted against a governmental entity, the governmental entity can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom. Thus, although the municipality may not be held liable for a constitutional tort under § 1983 on the theory of vicarious liability, it can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978)).

Plaintiff contends here that the Constitutional right infringed was the right of procedural due process.  Procedural due process involves notice and the right to be heard before any significant deprivation of a protected right.  *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998). To establish a procedural due process claim, the plaintiff must show that: "'(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide due process of law.' " *Chambers ex rel. Chambers v. School Dist. of Phila. Bd of Educ.*, 587 F.3d 176, 194 (3d Cir. 2009) (*quoting Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006)).  The deprivation by state action of a constitutionally protected interest in 'life, liberty, or property,' is not itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of the law." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

14

We conclude, easily, that this case involves the deprivation of an individual liberty interest protected by the Fourteenth Amendment. *See Addington v. Texas*, 441 U.S. 418, 425 (1979) (recognizing that civil commitment represents a loss of personal liberty that requires procedural due process protection).

We turn to the next question: whether the procedures available provided Plaintiff with due process of law. "Due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Procedural due process claims are governed by the standard first enunciated in *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976). Under that standard, a court is to weigh three factors: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used" and the value of "additional or substitute procedural safeguards," and (3) the governmental interest "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Id.*

Although Plaintiff does not clearly articulate his due process theory, he appears to contend that he was denied due process by the County's custom of presenting petitions during Section 303 proceedings that it "knew to be predicated on involuntary, unknowing waivers that had been made without the benefit of consultation with counsel." (Pl. Mot. at 3). Specifically, Plaintiff claims that the County's custom was to obtain waivers from patients without informing them that they were represented by counsel and had a right to a hearing.

However, Plaintiff has failed to provide any evidence to support his allegations concerning the County's alleged custom. There is a major difference between what Plaintiff

15

claims happened to him and what the evidence of record reflects was the custom.  Most notably, Plaintiff alleges that he waived his right to a hearing without being informed of any of his rights. However, the record reflects that, under the procedure routinely used by the County, the patient meets with Dr. Barry, who explains the procedure to the patient, and who tells the patient that the MHPA affords him the right to a hearing, and the right to an attorney to represent him at the hearing.  (Havens Dep. at 43-44).  If the patient wishes to have a hearing, the patient is given a hearing.  If the patient wishes to be represented by counsel, the patient is provided with a court-appointed attorney.

We fully credit Plaintiff's version of his own experience, and accept for purposes of this motion that he was not informed of his rights when he waived his hearing.  However, this single, anomalous situation does not establish that this was the County's custom.  Indeed, "it is well established law in this Circuit that a policy or custom, sufficient to maintain a 1983 claim, cannot be inferred from one single instance of misconduct."  *Gallagher v. Allegheny County,* No. 09-103, 2011 U.S. Dist. LEXIS 7047, at *21 (W.D. Pa. Jan. 25, 2011) (further citations omitted). Here, Plaintiff has not come forward with any evidence to rebut the County's evidence about what the custom was, such as an expert report, or other patient complaints that they waived their rights without being informed of them, and/or the consequence of their decision to waive those rights.  Thus, the uncontroverted record evidence is that patients customarily are advised of their right to counsel, and a hearing, before they are involuntarily committed under Section 303.  That Plaintiff was not so advised is insufficient to establish municipal liability under *Monell* and it's

progeny.[11]

Furthermore, to the extent Plaintiff is attempting to challenge the constitutionality of the process <u>typically</u> used by the County with patients undergoing Section 303 hearings, Plaintiff points to no legal authority, or competent evidence, to support the conclusion that this pre-deprivation procedure is constitutionally inadequate.[12]  As discussed above, the uncontroverted

_____

[11]  Furthermore, I note that, even if the record contained evidence showing that County agents had failed to follow the procedure established by the MHPA, the state has provided a post-deprivation judicial mechanism for challenging any errors in the pre-deprivation process. In situations where a local government errs in following its established procedures, the Third Circuit has held that "a state provides adequate due process when it provides reasonable remedies to rectify a legal error by a local administrative body."  *DeMutis v. Phoenixville*, No. 90-3519, 1990 U.S. Dist. LEXIS 8311, at *8-9 (E.D. Pa. July 5, 1990) (citing *Cohen v. City of Philadelphia*, 736 F.2d 81, 86 (1984)).

As discussed herein, the County's customary pre-deprivation procedures comply with their procedural due process obligations.  To the extent that any errors occur during these procedures, the MHPA provides a mechanism for a post-deprivation challenge of the state's action.  If, at the Section 303 hearing, the Mental Health Officer orders the patient to be involuntarily committed, the patient has the right to appeal his involuntary commitment by petitioning to the Court of Common Pleas.  50 P.S. § 7303(g), 7309(b).  On appeal, a Judge of the Court of Common Pleas will review the findings of the Mental Health Review Officer.  *See In re Interest of K.L.S.*, 594 Pa. at 198-99.

Plaintiff testified that he did not appeal his involuntary commitment while he was confined because he was not aware that an appeal was an available option.  (T.R. Dep. at 124-25).  After Plaintiff was released and hired an attorney, he filed a "Petition for Expungement of Mental Health Commitments Pursuant to 50 P.S. §§ 7109 and 7303 of the [MHPA]" in the Delaware County Court of Common Pleas, seeking to expunge his involuntary commitments under Section 302 and Section 303.  (Def. Ex. O).  On February 28, 2013, the Court of Common Pleas issued a decision denying the Petition for Expungement under 50 P.S. §§ 7109 and 7303. Given that Sections 7109 and 7303 are the sections in the MHPA addressing post-deprivation procedures, it appears that Plaintiff has taken advantage of the state's post-deprivation procedures.  Plaintiff has since appealed the denial of his Petition for Expungement to the Pennsylvania Superior Court.  This appeal remains pending.

[12]  A patient facing involuntary commitment proceedings is arguably in a vulnerable position.  Importantly, patients are presumed competent until they are proven otherwise at a hearing.  *See Benham v. Edwards*, 678 F.2d 511, 514 (5th Cir. 1982) ("Mental Health Code

evidence concerning the procedure typically used by the County reveals that the patient is given an opportunity to have a hearing where he will be represented by counsel; he may also choose to waive his hearing by agreeing to further treatment. This procedure satisfies the requirements of due process. *See Vitek v. Jones*, 445 U.S. 480, 495-96 (1980) (holding that the transfer of a prisoner to a mental health facility must be accompanied by: (1) advance written notice that transfer is being considered, (2) a hearing at which the prisoner is given notice of the evidence being relied upon and at which the prisoner may present documentary evidence and be heard in person, (3) an opportunity to present witnesses and to confront and cross-examine witnesses, except upon a finding otherwise for good cause, (4) an independent factfinder, (5) a statement of the evidence relied upon and the reason for transfer, and (6) effective and timely notice of all the foregoing rights).

In attempting to articulate his due process claim, Plaintiff focuses primarily on his contention that waivers of Section 303 proceedings were obtained without counsel. However, the Supreme Court has taken the position that counsel is not required to satisfy due process protections in civil commitment proceedings. Indeed, in *Vitek v. Jones*, 445 U.S. 480, 482-84 (1980) (plurality opinion), the Supreme Court took the position that, while the appointment of counsel may be desirable in civil commitments, it was not a constitutionally mandated procedural due process protection.[13]  445 U.S. 480, 497-500 (1980) (plurality opinion); *see also*

───────────────

committees are not presumed to be mentally ill at either their commitment or recommitment hearings"). The record before us is devoid of any evidence to support a contrary conclusion. Therefore, the waivers were obtained at a time when the competence of the individual waiving their rights is presumed.

[13]  Justice Powell's concurrence–which held that the right to state-furnished counsel is not constitutionally mandated to comply with procedural due process–is the narrowest reading of

*Hasher v. Goodwin*, No. 08-5787, 2010 U.S. Dist. LEXIS 135838, at *17 (D.N.J. Dec. 21, 2010)

(noting that the Supreme Court has not extended the right to counsel to involuntary commitment

proceedings).  Indeed, as Plaintiff acknowledges, the right to counsel afforded to him here arises

through Pennsylvania's MHPA.  That the state has adopted a statute that creates such rights does

not mean that the rights are constitutionally guaranteed.  In the context of a *Monell* claim, there

is a major difference between a state-created right and a constitutional right.  "The simple fact

that state law prescribes certain procedures does not mean that the procedures thereby acquire a

federal constitutional dimension."  *United States v. Jiles*, 658 F.2d 194, 200 (3d Cir. 1981)

(quotation omitted).  In other words "a state does not violate an individual's federal

constitutional right to procedural due process merely by deviating from its own established

procedures."  *Hayes v. Muller*, No. 96-3420, 1996 WL 583180, at *7 (E.D. Pa. Oct. 10, 1996);

*see also See Rowe v. Fauver*, 533 F. Supp. 1239, 1246 n. 10 (D.N.J. 1982) ("a failure by state

officials to follow state procedural regulations not independently required by the Constitution

fails to state a claim under the Due Process Clause.").  Thus, the MHPA does not create a

Constitutionally-protected right.

 Moreover, even if we assume that patients have a constitutional right to counsel and a

hearing, the record is devoid of facts or argument to support the suggestion that these rights are

not waivable.  Other federal courts considering this issue have all held that the right to an

---

the plurality opinion and thus represents the Supreme Court's position on this issue.  *See Marks
v. United States*, 438 U.S. 188, 193 (1977) (a court is compelled to construe a plurality decision
as announcing a rule that is based on the position taken by the justices "who concurred in the
judgments on the narrowest grounds."); *see also Ramsey*, 2012 U.S. Dist. LEXIS 126890, at *14
n.10 (citing Justice Powell's "controlling concurring opinion" for the premise that the Sixth
Amendment's right to counsel does not extent to individuals in civil commitment proceedings).

involuntary commitment hearing is waivable.  *See French v. Blackburn*, 428 F. Supp. 1351

(M.D. N.C., 1977) ("All courts which have addressed this issue have held that the presence of

one subjected to an involuntary commitment hearing could be waived or excluded") (collecting

case).  Courts have also held that such waivers are only effective if they are given voluntarily

and intelligently, *see*, *e.g.*, *See Suzuki v. Quisenberry*, 411 F. Supp. 1113, 1129 (D. Haw. 1976).

In the present case, the record is devoid of evidence to support the assertion that the County's

policy produced unknowing or involuntary waivers.[14]   The record establishes that patients were

informed of their rights by Dr. Barry, and patients could elect to waive those rights.  The record

contains no factual or legal support for the proposition that allowing patients to waive their right

to a hearing and/or counsel is a procedural due process violation.[15]  *See Piankhy v. Culyer*, 703

F.2d 728, 732 (3d Cir. 1983) (a waiver is knowing and intelligent if the defendant was

sufficiently informed of the right being waived); *cf. United States v. Pelensky*, 129 F.3d 63, 68

(2d Cir. 1997) (holding that Constitution does not require a court to elicit a formal waiver of

procedural rights from a defendant who stipulates that he has committed a supervised release

---

[14]  Plaintiff's own experiences do not answer the question of whether waivers made after the patients' rights are explained are "unknowing and involuntary," because Plaintiff contends that he was never advised that he could have a hearing, and/or that he could have counsel represent him at the hearing.

[15]  In *Matthews*, the Supreme Court emphasized that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." 442 U.S. at 333.  Other Courts have noted that it is the <u>opportunity</u> for a hearing that is required under *Matthews*.  *See Hubbard v. Hanley*, No. 09-10265, 2010 U.S. Dist. LEXIS 46550, at *13-14 (S.D.N.Y. May 12, 2010) (addressing *Matthews* in a situation where the plaintiff had waived his right to a hearing).  Therefore, as discussed further above, offering a hearing and allowing for a waiver of that hearing is consistent with the teachings of *Matthews*.  *See Gansas v. City of New York*, 240 F. Appx. 435, 438 (2d Cir. 2007) (explaining that the opportunity to have a hearing — which is waived — is enough to satisfy the procedural due process obligations described in *Matthews*).

violation); *Ramsey v. Runion*, No. 11-396, 2012 U.S. Dist. LEXIS 126890, at *22 (E.D. Va. Sept. 5, 2012) (due process does not require a court to make an on-the-record determination that a prospective civil committee has knowingly and voluntarily waived procedural rights).

Viewed in its entirety, the procedures used by the County during initial proceedings, and the appeal procedures provided by the MHPA, provide sufficient procedural due process protections.  There is no factual dispute as to the manner in which such proceedings are typically conducted, and there is no legal authority cited to support the conclusion that the procedures are constitutionally inadequate.  Plaintiff's inability to come forward with evidence from which a reasonable jury might conclude that the County's policy violates procedural due process rights is fatal to his claim.  Summary judgment is therefore appropriate.

**B.      Claims brought under the ADA and RA.**

Plaintiff also brings claims under the Americans with Disability Act, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, against the County.  Plaintiff claims that "OBH's policy of coordinating and presenting involuntary commitment hearings that it knows to be predicated on unknowing and involuntary waivers of the right to consult with counsel and to be present at the hearing is an unreasonable and unlawful failure to accommodate persons such as plaintiff."  (Am. Compl. ¶ 90).  According to Plaintiff, this policy discriminates against the mentally ill by denying them the benefits of the County's Psychiatric Emergency Commitment Procedures under Section 303 of the MHPA.  (*Id*. ¶ 90-91).  Plaintiff claims that as a result of the County's failure to accommodate him, he was unlawfully excluded from the services associated with Section 303 proceedings to which he was entitled.  (*Id*. ¶ 92).

Title II of the ADA provides, in relevant part, that "no qualified individual with a

disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Covered public entities are defined to include state and local governments and their agencies and instrumentalities.  42 U.S.C. § 12131(1).  Section 504 of the Rehabilitation Act imposes parallel restrictions on local governments that receive federal financial assistance.  29 U.S.C. § 794.  The same standards govern both RA and ADA claims.  *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009).

The Third Circuit has recently made clear that, when, as in this case, a plaintiff seeks compensatory damages under § 202 of the ADA and § 504 of the RA,[16] he must show intentional discrimination.[17]  *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261 (3d Cir. 2013).  In order to establish intentional discrimination, a plaintiff bears the burden of proving that: (1) he is a qualified individual with a disability; (2) he was excluded from participation in a

---

[16]  Plaintiff does not seek declaratory or injunctive relief in his Amended Complaint, and indeed a request for any such relief would be moot because he can no longer benefit from a procedural change enacted by the County.

[17]  Furthermore, Plaintiff has not provided argument or facts attempting to establish discrimination under either of the alternative theories of discrimination, namely, a disparate impact theory, *see Cinnamon Hills Youth Crisis Ctr. V. St. George City*, 685 F.3d 917, 922 (10th Cir. 2012) (explaining that, to prove a disparate impact claim, the plaintiff must show, generally by statistical evidence involving appropriate comparables, that a specific policy caused a significant disparate effect on a protected group), or a reasonable accommodation theory, *see Wisconsin Community Servs. v. City of Milwaukee*, 465 F.3d 737, 752-53 (7th Cir. 2006) (explaining that a plaintiff proceeding under this theory must establish that the defendant refused to provide a reasonable modification to its policies, practices, or procedures); *Oconomowoc Residential Programs v. City of Greenfield*, 23 F. Supp. 2d 941, 955 (E.D. Wis. 1998) (noting that ADA plaintiffs have the burden of seeking an accommodation before seeking relief in a judicial forum).

public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion or discrimination was due to the disability. *Chambers*, 587 F.3d at 189*; Muhammad v. Court of Common Pleas,* 483 F. App'x 759, 762 (3d. Cir. 2012) (not precedential). Proof of either discriminatory animus or deliberate indifference may satisfy that showing. *Id.* at 264. To satisfy the deliberate indifference standard, a plaintiff must establish both: (1) knowledge that a federally protected right is substantially likely to be violated; and (2) failure to act despite that knowledge. *Id.* at 265.

In its motion for summary judgment, the County contends that, "[a]t the end of this case there is simply no evidence of discriminatory animus on the part of the County and there is no County policy or practice that would support such a claim."[18] (Mot. 27, ECF No. 39). In order to withstand summary judgment, Plaintiff was required to "make a showing sufficient to establish the existence of . . . element[s] essential to [his] case, and on which [he] will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322; Fed. R. Civ. P. 56(c)(1) (explaining that a party opposing summary judgment must support each essential element of that party's opposition by "citing to particular parts of materials in the record"). Plaintiff failed to do so.

First, there is no evidence in the record to support an inference that the County acted with discriminatory animus or ill will toward Plaintiff because he was mentally ill. *See, e.g.*, *Shariff v. Coombe*, 655 F. Supp. 2d 274, 304-05 (S.D.N.Y. 2009) (awarding summary judgment to defendant on ADA and RA claims because the record did not contain any evidence that

---

[18]  The Supreme Court made clear in *Celotex* that the party moving for summary judgment does not bear the burden of producing evidence showing the absence of a genuine issue of fact; rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

defendants harbored any ill will towards plaintiffs because of their disabilities).  Nor is there any evidence to support an inference that the County actors were aware that its practices in coordinating and presenting involuntary commitment hearings were substantially likely to result in involuntary waivers of counsel because they were mentally ill, and made a deliberate choice not to protect the patients' right to counsel.  *See, e.g., S.H.*, 729 F.3d at 297 (explaining that allegations that one "should have known" will not satisfy the knowledge prong of deliberate indifference, and that application of this standard requires a deliberate choice, rather than negligence or bureaucratic inaction).  In fact, there is no evidence whatsoever in the record demonstrating a causal connection between the County's practices and the patients' disabilities.  Plaintiff alleges in the Amended Complaint that the mentally ill are less likely to understand and/or assert their rights, and that, as a result of his mental illness, he was denied his rights; however, Plaintiff has not provided any evidence to support these contentions either with respect to the mentally ill as a group, or himself in particular.  *See Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) ("An inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment").

Because Plaintiff has not come forward with any evidence that would allow a reasonable jury to find that the County intentionally discriminated against him during the Section 303 proceedings, Defendant's Motion for Summary Judgment as to Plaintiff's ADA and RA claims shall be GRANTED.

24

**IV.     CONCLUSION**

Plaintiff has failed to create a genuine issue of material fact as to his *Monell* claim against the County (Count I) and his ADA and RA claims (Count II).  Accordingly, Defendants Motion for Summary Judgment is **GRANTED.**

An appropriate Order follows.

BY THE COURT:


  /s/ Lynne A. Sitarski
_____

LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE